# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSHUA H. NILSSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 09-40019-FDS |
| ) | |
| MASSACHUSETTS DEPARTMENT OF ) | |
| CORRECTION, HAROLD W. CLARKE, ) | |
| JAMES SABA, RAYMOND MARCHILLI, ) | |
| and ANITA COLLINS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SAYLOR, J.

    This is an action arising out of a prisoner's request for permission to bring food and a special calendar into his cell in order to observe individualized Wiccan rituals. Plaintiff Joshua Nilsson is an inmate at North Central Correctional Institution-Gardner ("NCCI-Gardner"). He alleges that prison administrators violated federal and state laws by limiting his ability to practice certain rituals associated with his religious faith. There is no dispute that he is permitted to practice the Wiccan religion in a group setting; he contends, however, that he practices a solitary form, and that he can only do so with the food and calendar in his cell.

    The defendants are the Massachusetts Department of Correction, Harold W. Clarke (the Commissioner of Correction), James Saba (the Superintendent of NCCI-Gardner), Raymond Marchilli (the Deputy Superintendent), and Anita Collins (the Director of Treatment). Defendants contend, among other things, that plaintiff has failed to exhaust his administrative remedies as to

his claims.

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment. For the reasons stated below, the motion for summary judgment will be granted.

I. **Factual Background**

   A. **Allegations of Complaint**

Plaintiff Joshua Nilsson is an inmate at NCCI-Gardner. (First Am. Compl. ¶ 3). He has been confined there since December 5, 2008. (*Id.* at ¶ 14).[1]

Nilsson states that his religious faith is Wiccan, and that he practices it in a solitary fashion.[2] He contends that he observes 32 holy days each year. (*Id.* at ¶¶ 11-13).[3] He also contends that he "abstains from [group worship], due to difference[s] in personal beliefs." (*Id.* at ¶ 16).

Nilsson asserts that in order to exercise his religion freely, he must be permitted to bring a tray from the prison kitchen back to his cell containing two juices and two cakes to perform religious rituals on each of these holy days. (*See id.* at ¶¶ 12-15). He also asserts that he needs a Wiccan calendar in his cell to aid him in his worship. (*Id.* at ¶ 27-32). As set forth below, prison officials at NCCI-Gardner have denied these requests. (*Id.* at ¶¶ 15-24, 33-35).[4]

---

[1] Nilsson is apparently serving a sentence for second-degree murder.

[2] According to Nilsson, Wiccans normally practice in a group, called a coven, but he is a solitary Wiccan, who practices alone.

[3] The allegations are inconsistent as to whether there are 32 or 33 such days. It may be that the discrepancy is due to the fact that the solar and lunar calendar do not precisely align, and therefore the number of such days may fluctuate from year to year.

[4] At this stage, there is nothing in the record indicating that the particular religious doctrine plaintiff follows requires that he have food and calendar in his cell.

2

### 1. <u>**The Tray of Food**</u>

On December 7, 2008, Nilsson first asked permission to bring a tray of juices and cakes back to his cell. He made the request to Anita Collins, the Director of Treatment at NCCI-Gardner. (*Id.* at ¶ 15). Collins denied the request on December 10, 2008. (*Id.* at ¶ 16). That same day, Nilsson filed a grievance with the institutional grievance coordinator at NCCI-Gardner, William Winn. (*Id.* at ¶ 19).

Winn denied Nilsson's grievance on January 9, 2009. (*Id.*). Nilsson then appealed that decision to defendant Marchilli, who denied the appeal on January 13, 2009. (*Id.* at ¶ 20).

On January 19, 2009, defendant James Saba became superintendent of NCCI-Gardner. (*Id.* at ¶ 22). On January 19, Nilsson sent a letter to Saba requesting that he reconsider Marchilli's denial. (*Id.* at ¶ 23). On January 30, Nilsson spoke to Saba and informally renewed his request. (*Id.* at ¶ 24). The complaint alleges that in response Saba "verbally threatened" to send him back to a higher security facility. (*Id.*).

On February 9, 2009, Saba formally declined to reverse Marchilli's decision. (*Id.* at ¶ 23).

### 2. <u>**The Calendar**</u>

On December 5, 2008, a Wiccan calendar that Nilsson had ordered arrived at NCCI-Gardner. (*Id.* at ¶ 27). Nilsson alleges that the calendar aids him in performing religious rituals and observing holy days. (*Id.* at ¶ 32). On December 11, NCCI-Gardner officials deemed the calendar contraband and confiscated it. (*Id.* at ¶ 28).

On December 14, 2008, Nilsson filed a grievance with Winn concerning the calendar

issue. (*Id.* at ¶ 33). Winn denied the grievance on December 31. (*Id.*). Nilsson filed an appeal with Marchilli, who denied his request on January 13, 2009. (*Id.* at ¶ 34). After Saba took over for Marchilli as superintendent of NCCI-Gardner, Nilsson requested that Saba review Marchilli's decision. (*Id.* at ¶ 35). Saba declined to reverse the decision. (*Id.*).

### B. Exhaustion of Remedies

#### 1. The Administrative Framework

The Department of Correction has promulgated regulations concerning the types of items prisoners may possess in their cells. *See* 103 Code Mass. Regs. § 403.10. A section of that policy provides that a prison should establish a list of approved religious articles and set forth a process by which prisoners may make requests to retain other articles in their cells.[5] The regulation provides for a Religious Services Review Committee to review such requests and to make recommendations to the Commissioner of Correction for approval. 103 Code Mass. Regs. 403.10(9). *See also* 103 Code Mass. Regs. §§ 471.00 (1998) *Inmate Religious Programs and Services* (establishing religious programs and services).

---

[5] The regulation provides as follows:

*Religious Articles*

A list of approved religious articles will be posted quarterly in the inmate libraries. If an inmate has a request for an item that is not on the list of approved religious articles, the inmate should submit his or her request to the Superintendent. The Superintendent will forward the request with a recommendation to the Religious Services Review Committee through the Director of Program Services for review. The Religious Services Review Committee ("RSRC") consists of the two Assistant Deputy Commissioners and the Director of Program Services, who functions as the chairperson of this Committee. This committee shall meet on an as needed basis to review requests for religious articles that are not already approved for retention and shall forward their recommendations to the Commissioner for his approval.

103 Code Mass. Regs. 403.10(9).

The Commissioner has issued a Religious Services Handbook to serve as a "tool and reference source for prison administrators and inmates." *See Rasheed v. Commissioner of Correction*, 446 Mass. 463, 475-477 (2006) (upholding Handbook as valid exercise of statutory and regulatory authority). The Handbook, as revised January 25, 2010, recognizes the Wiccan religion and has extensive provisions concerning its practice in prison. (Marchilli Aff. Ex. 1). It expressly authorizes the corporate (that is, group) celebration of various Wiccan holy days, including the consumption of cake and juice; it does not, however, specifically permit individual practices, such as the private consumption of cake and juice by a prisoner in his cell. (*Id.*). The Handbook does, however, permit prisoners to have six separate types of Wiccan religious items in their cells.[6] It also permits prisoners to have access to multiple other Wiccan items for corporate worship (although the items are not permitted to be kept in cells). (*Id.*). Finally, it provides a Wiccan calendar listing the names and dates of various holy days. (*Id.*).

The Handbook sets out the process by which inmates can make specific requests for other religious items. (*Id.*). Specifically, it provides the following:

> The following procedures should be utilized when processing requests for religious items or practices that are not addressed in the Religious Services Handbook:
>
> 1. Inmates are required to submit attachment A [a form entitled "Inmate Religious Services Request Form"] with all supporting documentation to the Superintendent's designee.
>
> 2. Attachment A is reviewed by the Superintendent's designee to ensure that it is complete and accurate.
>
> 3. The Superintendent will then forward his/her recommendation to the Religious Services Review Committee (RSRC) utilizing attachment B [a

---

[6] The items are tarot cards, a crescent moon necklace, "runes," a cloth bag for runes, a "Book of Shadows," and prayer oil. (*Id.* Ex. 2).

5

form entitled "Religious Services Request Form"]. The RSRC will consist of the Assistant Deputy Commissioner of the Southern Region, the Assistant Deputy Commissioner of the Northern Region, the Deputy Commissioner of Classification, Programs and Reentry, and the Director of Program Services.

4. The committee will review both attachments (A& B) and make a formal determination to the superintendent. The Handbook will then be amended accordingly. This review will be based on case law and commonly accepted practice and the Superintendent's recommendation.

(*Id.*).

In short, an inmate is required to submit an "Inmate Religious Services Request Form ("IRSR Form") to the Superintendent in order to request that prison authorities permit him to have certain religious items in his cell. The submission of the IRSR Form initiates the process by which the Religious Services Review Committee considers the request.

### 2. **Whether Plaintiff Submitted an IRSR Form**

The original version of the complaint, filed January 29, 2009, contained the following allegation:

On 12/13/2008 Nilsson sent Attachment "A" from the Religious Services Handbook to the superintendent[']s office as required for religious requests. Nilsson does not know if said attachment was processed by the superintendent's office and fo[r]warded to the Religious [Services] Review Committee pursuant to the procedure outlined in said handbook. . . .

(Orig. Complt. ¶ 12). Attached to the complaint was what purported to be a completed IRSR form signed by plaintiff and dated December 13, 2008. The handwritten portion of the IRSR stated the following in response to the question "What is your specific request?":

To be allowed cake [and] juice ritual trays from the kitchen to be brought back to my Cell/Dorm for my solitary rituals on Sabbats and Esbats. To have the Wiccan calendar ammended [sic] to include New Moons as Esbat Holy Days.

6

Plaintiff's "First Comprehensive Amended Complaint," filed April 27, 2009, alleges the following:

> On 12/13/2008, before Marchilli's decision, Nilsson sent attachment "A" to Marchilli for forwarding to the Religious Services Review Committee. . . .

(Orig. Complt. ¶ 21).[7]

Raymond Marchilli, the Deputy Superintendent of Classification, Programs and Treatment at NCCI-Gardner, submitted an affidavit in support of defendant's motion to dismiss or for summary judgment. Marchilli attested as follows:

> 4. I have read the First Amended Complaint and attachments served upon me by the plaintiff, Joshua Nilsson ("Nilsson"). I was not given the attached Inmate Religious Services Request Form by Nilsson on December 13, 2008 <u>or at any time prior</u> to my being served with this civil action on March 1, 2010. . . .
>
> 5. Further, I asked the Executive Administrative Assistant who processes all incoming mail for the NCCI-Gardner Superintendent, James Saba, myself and the other Deputy Superintendent of Security and Operations, to check the incoming mail log. However, no correspondence was found from Nilsson in this December 2008 time frame, <u>or at any later date</u>, concerning his request for a ritual tray of cake and juice to be brought back to his cell during Wiccan sabats and esbats.

(Marchilli Aff. ¶¶ 4-5) (emphasis in original).[8]

Anita Collins, the Director of Treatment at NCCI-Gardner, likewise submitted an affidavit. Collins attested that her duties include supervising all religious programs offered at NCCI-Gardner. (Collins Aff. ¶ 3). She further attested as follows:

---

[7] No "Attachment A" was included with the amended complaint; the paragraph presumably refers to the Attachment A to the original complaint.

[8] The Marchilli affidavit also states that cake and juice is provided to Wiccan inmates for corporate worship, but that the inmates cannot bring back any cake and juice to their cells. (Marchilli Aff. ¶ 8). The affidavit also states that other inmate religious groups are not permitted to eat religious food in their cells. (*Id.* ¶ 9). During Ramadan, Muslim inmates are not provided extra foods, but are permitted to eat their lunch and dinner when locked in their cells after sundown. (*Id.* ¶ 10).

7

15. . . . On February 9, 2009, Superintendent Saba informed Nilsson that if he deemed the retention of his Wiccan calendar to be an urgent matter, then he should request it through the Religious Services Review Committee as he was previously advised by the Institutional Grievance Officer ("IGC") William Winn. . . .

16. Mr. Nilsson did not complete and serve his Inmate Religious Services Request to me regarding either of these two topics: (1) being served 2 cakes and 2 juices on a ritual tray in his cell for the 32 Wiccan holidays he seeks to celebrate privately; or, (2) to retain his 2009 Wiccan calendar. Nilsson could have brought either/both issues to the attention of the Religious Services Review Committee as he was instructed to by Superintendent Saba or IGC Winn.

17. Nilssson [sic] chose not to do so despite being informed of this avenue of relief by NCCI-Gardner Superintendent Saba in his February 9, 2009 letter of reply to Nilsson and also by NCCI-Gardner Institutional Grievance Officer William Winn who gave Nilsson a blank Inmate Religious Services Request form, instructing him to complete it and submit it to me in my capacity as the Director of Treatment.

(Collins Aff. ¶¶ 15-17).[9]

Two exhibits appear to corroborate the statements of Marchilli and Collins, at least as to the calendar issue. First, the Inmate Grievance Appeal Form dated January 2, 2009, includes the following statement by Marchilli:

Calendars of any kind are not currently approved via DOC policy for ordering from the outside - including from vendors authorized for the purchase of other approved items such a[s] books and magazines. Non-denominational calendars are available free of charge through the library and those may be displayed in you[r] cell per the 400 policy excerpt you quote. *Should you seek a religious calendar from an outside vendor your should pursue this by filing a Religious Services Request form.*

(*Id.* Ex. 4) (emphasis added). Second, the letter from Superintendent Saba dated February 9, 2009, states the following:

---

[9] There is no affidavit on file containing first-hand testimony that Winn advised Nilsson to make a request to the RSRC. Winn (who has since passed away) submitted an affidavit, but the affidavit did not address that issue. The Court will therefore not consider the evidence that Winn gave Nilsson advice as to the form.

8

> Please be advised that your request for calendars has been addressed in numerous ways. At the present[,] prime calendars are not permitted here at NCCI. We are in the process of reviewing this current practice and I ask that you be patient during this time. *If you feel the need for a calendar to be of an urgent matter and wish to request it through the Religious Services Review Committee as previously advised.*

(*Id.* Ex. 4A) (emphasis added). Both documents are dated after December 13, 2008; presumably, neither individual would have advised Nilsson that he needed to file a form if such a form had already been filed.

Nilsson has submitted no affidavit or other sworn statement attesting that he actually submitted the completed IRSR Form, or authenticating the document purporting to be a completed IRSR Form. There is no evidence in the record of any action taken by the Religious Services Review Committee in response to any IRSR Form submitted by Nilsson.

### C. Procedural Background

Nilsson originally filed this lawsuit on January 29, 2009, and filed an amended complaint on April 27, 2009. He contends that the failure to accommodate his religious practices violates the United States Constitution and the Massachusetts Declaration of Rights. (First Am. Compl. at ¶ 41). The complaint asserts claims under 42 U.S.C. § 1983, the Massachusetts Civil Rights Act, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.

## II. Standard of Review

Defendants have filed a motion to dismiss, or in the alternative, for summary judgment. A motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56 "share a functional nexus." *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir. 1990). The fundamental difference between the two motions is whether the court will consider "matters

'outside' the pleadings." *See id.* On a motion to dismiss the court only considers the pleadings. *See id.*[10] On a motion for summary judgment, however, the court will consider other evidence, such as affidavits. *See id.* A court can transform a motion to dismiss into a motion for summary judgment. *See id.*; Fed. R. Civ. P. 12(d). Because resolution of the motion here requires consideration of matters outside the pleadings, the Court will treat it as a motion for summary judgment.

### A. Standard for Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Essentially, [Rule 56] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

### B. Evidence That May Be Considered for Summary Judgment

Generally speaking, evidence must be admissible at trial in order to be considered on summary judgment. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990). A significant exception is affidavits; under Rule Fed. R. Civ. P. 56(c), affidavits, although not

---

[10] Material attached to a complaint, or incorporated by reference, are a part of the pleading itself, and the Court may consider them without converting a motion to dismiss into a motion for summary judgment. *Trans-Spec Truck Serv. v. Caterpillar*, 524 F.3d 315, 321 (1st Cir. 2008).

10

themselves admissible at trial, may be offered in support of, or opposition to, summary judgment if they set forth facts that would be admissible under the Federal Rules of Evidence. *See id.*

In order to be admissible at trial, a document must be authenticated. Generally, authentication requires competent testimony concerning the document. *See* Fed. R. Evid. 901(b)(1). Certain categories of documents are self-authenticating under Fed. R. Evid. 902, and require no extrinsic testimony. Each document submitted in support of summary judgment must either be properly authenticated, or must be self-authenticating under the Federal Rules. *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2722 at 382 (3d ed. 1998). The authentication requirement is rarely onerous; in many instances, a single sentence will suffice, indicating that the document is what it appears to be.

### III. Analysis

Defendants advance essentially four arguments in support of their motion to dismiss. First, they contend that plaintiff has failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act. Second, they contend that the doctrine of sovereign immunity and the Eleventh Amendment bar suit against the defendants in their official capacities. Third, they contend that the doctrine of qualified immunity bars suit for money damages against defendants in their individual capacities. Fourth, they contend that plaintiff has failed to allege sufficient facts to support his claims and therefore that they must fail as a matter of law.

For the reasons set forth below, the Court will reach only the first issue.

#### A. Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act sets forth certain requirements before a suit by a

11

prisoner can be filed in federal court.  *See* 42 U.S.C. § 1997e (2010); *Woodford v. Ngo*, 548 U.S. 81, 84 (2006).  The PLRA was intended to reduce frivolous prisoner litigation relating to conditions of confinement.  *Woodford*, 548 U.S. at 84-85.  Among other things, the statute requires that prisoners exhaust administrative remedies before filing suit.  *See* 42 U.S.C. § 1997e(a); *Woodford*, 548 U.S. at 84; *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 34 (1st Cir. 2002); *Restucci v. Clarke*, 669 F. Supp. 2d 150, 159 (D. Mass. 2009).

As noted, the Massachusetts Department of Corrections has promulgated a "Religious Services Handbook" that sets forth an administrative process to address prisoner requests for accommodations related to religious practices.  Among other things, it requires inmates to submit an IRSR Form to a Religious Services Review Committee.  Defendants contend that the complaint must be dismissed because plaintiff did not submit an IRSR Form to the Superintendent and therefore did not exhaust his administrative remedies prior to filing suit.

As also noted, the complaint alleges that defendant submitted an IRSR Form, and the original complaint included an exhibit that purports to be an IRSR Form.  Specifically, the complaint alleges that on December 13, 2008, plaintiff sent an IRSR Form to defendant Marchilli to forward to the Religious Services Review Committee.[6]  Defendants, however, have submitted affidavits that state that no such form was ever submitted.

As an initial matter, there is no evidence, or even any allegation, that plaintiff ever filed a request with the Religious Services Review Committee to keep a calendar in his cell.  The IRSR Form that is attached to the original complaint asks for permission to bring cake and juice into his

---

[6] The original complaint alleges that plaintiff does not know if the form was "processed by the superintendent and fo[r]warded to the Religious [Services] Review Committee."  That allegation was dropped from the amended complaint.

12

cell. As to the calendar, it states only the following:

> What is your specific request?
>
> . . . To have the Wiccan calendar ammended [sic] to include New Moons as Esbat Holy Days.

That is plainly insufficient to establish exhaustion of remedies as to plaintiff's claim to have a calendar in his cell. At a minimum, a prison official reviewing the form would not be on notice that plaintiff was making such a request. Thus, even assuming that plaintiff did in fact submit the IRSR Form to Marchilli, and even assuming that he (or the Committee) either failed to take action or failed to notify plaintiff of any decision, plaintiff's claim as to the calendar must still fail. To that extent, therefore, the action must be dismissed for failure to exhaust.

The purported IRSR Form attached to the original complaint does, however, include a specific request that plaintiff be permitted to take cake and juice to his cell. As noted, defendants dispute that the form was ever submitted. The question presented is whether plaintiff made a sufficient showing as to that issue to defeat summary judgment.

Defendants submitted affidavits from Raymond Marchilli, the Deputy Superintendent, and Anita Collins, the Director of Treatment. In substance, Marchilli and Collins contend that they never received an IRSR Form from the plaintiff, and that no such form was logged in as part of the prison record-keeping system. The affidavits are made on personal knowledge, and otherwise comply with the requirements of Fed. R. Civ. P. 56(c)(4).

Notwithstanding the allegations of the complaint, plaintiff has submitted no affidavit or other sworn statement that he did, in fact, submit the form to Marchilli, or that the document

purporting to be the completed IRSR Form is authentic.[7]

Defendants have thus submitted competent evidence that the form was *not* sent, and plaintiff has submitted no admissible evidence to the contrary. For summary judgment purposes, mere allegations are not enough; evidence must be submitted to the Court—in either admissible form or as affidavits—for facts to be considered "disputed" within the meaning of the rule. Accordingly, for present purposes, the Court will assume that plaintiff did not submit a completed IRSR Form, as required by the Religious Services Handbook.

Plaintiff's response is *not* to present evidence that he did, in fact, submit the form, but rather to argue that the form was not in fact legally required. In substance, plaintiff argues that because the procedures in the Handbook are not specifically incorporated in the Inmate Grievance Policy, 103 Code Mass. Regs. 491.00 *et seq.*, he did not have to follow those procedures to exhaust his remedies.

Plaintiff's argument essentially ignores the parallel regulation set forth in 103 Code Mass. Regs. § 403.00, which authorizes the establishment of the Religious Services Review Committee and requires that prisoner requests be screened by the Committee. That regulation, and those procedures, have been upheld by the Supreme Judicial Court as lawful. *See Rasheed*, 446 Mass. 463, 476-477 (2006). Indeed, the SJC specifically held that the Handbook "is valid and in accord with relevant statutory and regulatory authority." *Id.* at 477. Accordingly, and contrary to plaintiff's argument, the submission of the IRSR Form was in fact necessary in order to exhaust his remedies.

---

[7] This is not a trivial omission; the issue of whether plaintiff actually submitted the form is central to this dispute, and defendants plainly and vigorously disputed that fact in their opposition.

Thus, the undisputed evidence, as presented to this Court, is that plaintiff failed to exhaust his administrative remedies before filing suit in federal court as required by 42 U.S.C. § 1997e(a). Congress intended that the exhaustion-of-remedies requirement for prisoner lawsuits be strictly enforced, in order to reduce frivolous litigation, protect the administrative authority of prison officials, and resolve conditions-of-confinement issues quickly and economically. *See Woodford*, 548 U.S. at 84-85, 88-91. It is true, of course, that plaintiff here is proceeding *pro se*, and that *pro se* litigants are normally permitted a certain degree of latitude and indulgence from the Court. But in this context, at least, the requirements of the statute must be adhered to strictly, or the statutory purpose will be wholly undermined. The law requires that plaintiff prove that he has exhausted his administrative remedies. He has failed to do so. For that reason, summary judgment will be granted for the defendants.

### B. Other Issues

Because exhaustion of remedies is a prerequisite to any claim by a prisoner concerning conditions of confinement, under any legal theory, it is not necessary to address defendants' remaining contentions.

## IV. Conclusion

For the foregoing reasons, the motion of the defendants to dismiss or for summary judgment, treated as a motion for summary judgment, is GRANTED.

**So Ordered.**

                                              /s/ F. Dennis Saylor
                                              F. Dennis Saylor IV
                                              United States District Judge

Dated: March 30, 2011